UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Michael A. Wolf, | ) | Case No. 14 B 27066 |
| | ) | |
| Debtor. | ) | Hon. Deborah L. Thorne |
| | ) | |
| | ) | |
| N. Neville Reid, not individually but | ) | Adversary No. 16 A 00066 |
| solely in his capacity as Chapter 7 | ) | |
| Trustee for bankruptcy estate of | ) | |
| Michael A. Wolf | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Michael Wolf, Scott Wolf, Peter Wolf, | ) | |
| Zig-Zag, Corp., ZZC, Inc. MMQB, Inc., | ) | |
| Hound Ventures, Inc., SHBM, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### Introduction & Background

This matter comes before the court upon the motion of the trustee to have default

judgments entered against various defaulted Defendants in these proceedings. Namely, the

trustee seeks the entry of a default judgment against Zig Zag Corporation (Zig Zag), ZZC, Inc.,[1]

Michael Wolf, Scott Wolf, Peter Wolf, SHBM, Inc. (SHBM), Hound Ventures, Inc. (Hound

Ventures), and MMQB, Inc (referred to throughout as MMQB, Inc. so as not to confuse the

entity with the underlying "MMQB business" allegedly held by this entity and others). All have

---

[1] There is both a Delaware and an Illinois ZZC, Inc. The court refers to them collectively as "ZZC, Inc."
or simply "ZZC."

1

been defaulted either for failing to answer or for having disregarded this court's discovery orders.

For reasons given more fully below, the court finds for the trustee and against Scott Wolf on Counts 1, 5, 6, 7, 8, 9, and 12 of the complaint. The court also finds for the trustee and against ZZC, Inc. on Counts 1, 7, 8, 9, and 10 of the complaint. The court further finds for the trustee and against Michael Wolf on Counts 15, 16, 17, and 18 of the complaint. The court would find for the trustee and against MMQB, Inc. on Counts 1, 7, 8, and 9 of the complaint but for constitutional concerns, so the court will issue a separate order delineating Parts II, III, IV, VI.a, VI.g.1, VI.h.1, VI.i.1, and VI.r.2 of this opinion as its proposed findings of fact and conclusions law, with one of the court's ultimate proposed conclusions of law being that judgment be entered in favor of the trustee and against MMQB, Inc. on Counts 1, 7, 8, and 9 of the complaint.

The trustee's theory, in the main, concerns the alleged transfer of a family publishing business, the Monday Morning Quarterback (MMQB business), in late 2011 or early 2012 from one corporation (Zig Zag) wholly owned and controlled by the Debtor, Michael Wolf, to another corporation (ZZC) initially wholly owned and controlled by the Debtor. Allegedly, 51% of the stock in ZZC was, at the time that ZZC still owned the MMQB business, transferred from Michael to Scott Wolf, Michael's son, as well. The MMQB business was then transferred to another corporation (MMQB, Inc.) wholly owned and controlled by Scott Wolf.

Then, as alleged,[2] MMQB, Inc. funneled income from the business to various other related entities, including Hound Ventures and SHBM, Inc.,[3] as well as to Scott Wolf and

---

[2] The court, upon a review of the main complaint and the separate complaints against SHBM, Inc., MMQB, Inc., and Hound Ventures, Inc., treats SHBM, Inc. and Hound Ventures Inc. as potential subsequent transferees of profits/proceeds/products of the MMQB business under section 550(a)(2) of the Code. The court otherwise proceeds count-by-count in the main complaint only.

[3] Both wholly owned and controlled by Scott Wolf.

Michael Wolf. This type of income-transferring happened when the MMQB publishing business was earlier held by the ZZC entity, as well.

Allegedly, the Debtor's marital problems precipitated these transfers. He wanted the value of the business kept out of the hands of his then-existing and potential future creditors, most prominently his then-wife Elizabeth Wolf.

In December of 2013, divorce proceedings commenced. In July of 2014, the Debtor filed for bankruptcy. In early 2016, the trustee filed the present adversary proceeding seeking, in substance, to recover the value of the MMQB business for the benefit of the Debtor's estate.[4]

Some Defendants failed to answer; others failed to comply with discovery orders. These Defendants were then held in default. The trustee's request for default judgment against these Defendants has now followed. This opinion concerns that request.

## Discussion

### I.   Jurisdiction and Authority

### a.   Jurisdiction

The District Court has jurisdiction over all proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Most of the counts in this case – those based on turnover, fraudulent conveyance, preference, and post-petition transfer theories – arise under title 11, namely sections 542, 544, 547, and 548, and 549 of the Bankruptcy Code. The

---

[4] There are other theories, such as the tortious interference theories, discharge-denial theories, and preference/fraudulent transfer theories (regarding payments made to ZZC), that do not concern the value of the MMQB business or the entities allegedly holding or having held that business. Nothing has been presented to the court, however, indicating that the Plaintiff does not want the entire complaint adjudicated by the court in entering default judgment against the defaulted Defendants. In the interest of finality, this court will adjudicate every count in the main complaint as against the defaulted Defendants. This opinion and any related orders/judgments issued in relation to this opinion leave nothing further to be adjudicated by this court regarding the defaulted Defendants in these proceedings.

same is true of the counts relating to the Debtor's discharge, which arise under section 727 of the Bankruptcy Code.

Some of the remaining counts – those based on state law alter ego,[5] constructive trust, resulting trust, and breach of fiduciary duty / corporate waste theories, which could exist outside of the bankruptcy and which do not in and of themselves arise under any provision of title 11 – are *at least* "related to" the underlying bankruptcy case because their outcome affects the amount of property in the bankruptcy estate. *See Zerand-Bernal Grp., Inc. v. Cox*, 23 F.3d 159, 161–62 (7th Cir. 1994).

The remaining state law counts – those based on the injury to the estate caused by the Debtor's alleged tortious interference with the estate's post-petition contracts and business relations – "arise in a case under title 11" because, while based on state law tortious interference theories, the causes of action could not exist outside of this bankruptcy proceeding due to the fact that they arise out of an alleged post-petition injury practiced upon the estate, its business relations, and its contract rights vis-a-vis the attempted liquidation (sale) of property of the estate. *See Matter of Wood*, 825 F.2d 90, 97 (5th Cir. 1987) ("In other words, 'arising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.").[6]

"Each district court *may provide* that any or all cases under title 11 and any or all *proceedings arising under title 11* or *arising in* or *related to a case under title 11* shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a) (emphasis added). All of

---

[5] There is some confusion as to whether or not the alter ego claim, as asserted in this case, is a standalone action or really a mere adjunct to the trustee's other theories of relief. The court, out of an abundance of caution, treats the alter ego claim as a standalone action supplying the necessary predicate for most of the other relief that the trustee seeks in the complaint.

[6] Even if these particular counts did not "arise in" the bankruptcy case, they would still be "related to" the bankruptcy case.

the proceedings created by the assertion of these causes of action may therefore be referred by the District Court to the Bankruptcy Court. All of the proceedings created by these causes of action have, in fact, been referred to this Bankruptcy Court by the District Court for the Northern District of Illinois. *See* N.D. Ill. L.R. 40.3.1(a).

Jurisdiction therefore exists over all of these causes of action.

**b.  Statutory Authority**

"Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1). The statute then goes on to give examples of core proceedings. *See* 28 U.S.C. § 157(b)(2).

Here, the fraudulent transfer counts, both those based directly on section 548 and those based on the UFTA/section 544(b), are core. *See* 28 U.S.C. § 157(b)(2)(H). On the facts of this case, the constructive/resulting trust counts are also statutorily core,[7] since these trust counts both concern an alleged transfer of property for no consideration (or consideration supplied by the Debtor) in fraud of creditors' rights giving rise to an equitable ownership interest in favor of creditors the *enforcement* of which would effectively unwind (avoid and recover) the fraudulent transfer; that is, the trust counts' strong substantive resemblance in this case to true statutory UFTA/548 fraudulent conveyance actions makes them statutorily core. *Cf. Republic Credit Corp.*

---

[7] A good argument can be made that the resulting trust count is not statutorily core due to the theory inherently having nothing to do with remedying fraud, whether practiced on creditors or anyone else. In that event, *see In re Guy F. Atkinson Co. of California*, No. C 98-4577 SI, 2000 WL 52317, at *2 (N.D. Cal. Jan. 18, 2000), judgment on the count is effectively being entered against the trustee, as seen below, and the trustee has consented to this court's authority to enter final judgments, *see* 28 U.S.C. § 157(c)(2).

*I v. George K. Boyer (In re Boyer)*, 372 B.R. 102, 105 (D. Conn. 2007), *aff'd*, 328 F. App'x 711 (2d Cir. 2009).[8]

Both the preference count, *see* 28 U.S.C. § 157(b)(2)(G), and the section 549 count, *see In re Auxano, Inc.*, 96 B.R. 957, 960 (Bankr. W.D. Mo. 1989), are core. There is also no doubt that the objection to the Debtor's discharge is core. 28 U.S.C. § 157(b)(2)(J). Likewise, the turnover count is core. 28 U.S.C. § 157(b)(2)(E). The tortious interference counts are also core because they arose post-petition in favor of the estate based on a post-petition contract entered into for the purpose of liquidating estate property (one of the pieces of real property owned by the estate). *See* 28 U.S.C. § 157(b)(2)(A), (O).

For the remaining counts, each is core if "it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Barnett v. Stern*, 909 F.2d 973, 981 (7th Cir. 1990) (internal quotations and citations omitted). A state law alter ego action would not seem to fit this definition, and nowhere is such an action listed in section 157(b)(2). Nevertheless, perhaps because this type of action normally seeks a declaration that certain property only nominally held by third-parties is really property of the estate, it has been said that such an action is statutorily "core." *See Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, 649 F.3d 539, 550 (7th Cir. 2011) (noting that the action before the bankruptcy court in the *Barnett* case, an action to declare a trust to be the alter ego of the debtor and the assets of the trust to be property of the estate, *was* a core proceeding); *but see Barnett*, 909 F.2d at 981 (declining to adopt the broader formulation of core proceedings as those that

---

[8] That being said, there is a at least a formal difference between "avoiding" a transfer outright as to certain parties and granting remedies based on that avoidance, as happens under the fraudulent conveyance statutes, and declaring that the transferee of property holds the property in trust for some other entity (who, in equity, owns the asset), as apparently happens with non-statutory constructive/resulting trust actions.

have the effect of bringing property into the estate); *Matter of U.S. Brass Corp.*, 110 F.3d 1261,

1268 (7th Cir. 1997). As such, the court will treat the alter ego / reverse-veil piercing claim in

this case as statutorily core.

Finally, what of the cause of action asserted against officer/director-of-ZZC Scott Wolf

for allegedly breaching a fiduciary duty and/or wasting ZZC's corporate assets? Such a cause of

action is statutorily non-core. *See In re Integrated Health Servs., Inc.*, 291 B.R. 615, 618 (Bankr.

D. Del. 2003).

Thus, this court has statutory authority to enter a final judgment on each claim except for

the claim asserting a breach of fiduciary duty / corporate waste.

### c. Constitutional Authority

The court must also, however, satisfy itself that it has the constitutional authority to enter

a final judgment. *Stern v. Marshall*, 564 U.S. 462, 482 (2011) ("Although we conclude that §

157(b)(2)(C) permits the Bankruptcy Court to enter final judgment . . . Article III of the

Constitution does not.").

This court has the constitutional authority to enter a final judgment concerning the

fraudulent transfer claims. *See In re Peregrine Fin. Grp., Inc.*, 589 B.R. 360, 364–65 (Bankr.

N.D. Ill. 2018); *In re Kimball Hill, Inc.*, 480 B.R. 894, 906–07 (Bankr. N.D. Ill. 2012); *see also*

*In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 268–69 (Bankr. D. Del. 2017). Due to

their substantive resemblance in this case to fraudulent conveyance actions, the same is true of

the non-statutory resulting/constructive trust claims based on fraud and unjust enrichment.

There is also no *Stern* issue with the preference claim, *see, e.g.*, *In re Pantazelos*, 543

B.R. 864, 872-73 (Bankr. N.D. Ill. 2016), nor with the section 549 claim, *In re Felice*, 480 B.R.

401, 427–28 (Bankr. D. Mass. 2012). The objection to the Debtor's discharge obviously does not

run afoul of *Stern* in any respect, and the court may enter final judgment on those counts. *See*

*Stern*, 564 U.S. at 499. While based on state law, the tortious interference counts stem from the

bankruptcy itself since they are post-petition causes of action based on the alleged tortious

interference with post-petition estate contracts and business relations arising out of the sale and

liquidation of estate property. *See id.* Therefore, the court may enter final judgment on the

tortious interference counts.

The alter ego claim is different. Though statutorily core, the Seventh Circuit ruled in

*Wellness* that the bankruptcy court could not constitutionally enter a final order in such an action,

at least where the allegations are that the debtor's *trust*[9] is the alter ego of the debtor. *Wellness*

*Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 773–76 (7th Cir. 2013), *rev'd on other grounds*, 135

S. Ct. 1932 (2015). The Supreme Court did not reverse the Seventh Circuit on the basis that this

conclusion was incorrect, but rather on the basis that, regardless of whether the alter ego claim in

*Wellness* was a *Stern* claim or not, the parties could have consented to the bankruptcy court's

authority to enter a final order on the claim. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct.

1932, 1942 n.7 (2015); *Wellness*, 135 S. Ct. at 1954 (Roberts, C.J., dissenting) (describing the

majority's holding). In light of the pertinent part of the Seventh Circuit's opinion in *Wellness*,

which was not disapproved of by a majority of the Supreme Court, this court will treat the alter

ego claim in this case as one on which it may not constitutionally enter final judgment.

Thus, even though it is statutorily core, the court cannot constitutionally enter a final

judgment on the alter ego claim in this case. It may constitutionally enter a final judgment on

every other statutorily core claim, however. Considered together, the court may not, without

litigant consent, enter a final judgment on either the corporate waste / breach of fiduciary claim

or the alter ego claim.

---

[9] The case at bar involves no trusts, only corporations.

### d.  Consent

The bankruptcy court's lack of authority may be cured by litigant consent, express or implied. This is true for proceedings that are statutorily non-core. 28 U.S.C. § 157(c)(2). It is also true for proceedings that are statutorily core but that lie outside of the constitutional authority of the bankruptcy court. *Wellness*, 135 S. Ct. at 1948–49. The trustee has expressly consented to the entry of final judgments. In their initial answers, it can fairly be said that Michael and Scott Wolf expressly withheld consent to the bankruptcy court's entry of final judgments, as have MMQB, Inc., Hound Ventures, and SHBM. Zig Zag and ZZC have never filed an answer and, to this court's knowledge, have never been represented by counsel in this proceeding, thereby necessarily precluding these entities from having taken a legal position on this court's authority. "A corporation may appear in federal courts only through licensed counsel." *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 202 (1993).

Scott Wolf, however, filed a motion for summary judgment, asking this court to enter an order dismissing with prejudice certain counts of the complaint for failing to state a claim upon which relief could be granted, based in part on a divorce ruling that was issued during the pendency of these adversary proceedings.

He argues that Counts I–IX[10] should be dismissed with prejudice because a transfer of corporate property is not a transfer of shareholder property,[11] and the trustee's alter ego theory, which, if legally sound, would accomplish the required linkage between shareholder and corporate property in this case, is impermissible as a matter of Illinois law; further, he argues that Rule 9(b) is not met with respect to the fraudulent transfer counts, and, in any event, any possible

---

[10] Both Roman and Arabic numerals are used interchangeably below in reference to the numbered counts in the complaint.

[11] As a general principle, this is undoubtedly true.

recovery on *any* count belongs to Elizabeth Wolf, not the estate, due to the final divorce court
ruling. Hence Counts I-IX, those dealing with alter ego, constructive and resulting trust, and
fraudulent transfers, should, according to Scott, be dismissed with prejudice. Similarly, the
tortious interference counts (XIII–XIV) should be dismissed with prejudice due to the fact that
the marital home (and/or the proceeds of its sale) is no longer estate property, and the claims
arise out of the interference with the estate's contract to sell that property. Likewise, the
fiduciary duty / corporate waste claim (Count XII) should be dismissed because, according to
Scott, the stock in ZZC out of which such claim arises has been awarded entirely to Elizabeth
Wolf, rendering the trustee without standing to assert a claim based on the estate's ownership of
that stock, which is derivative of Michael Wolf's ownership on the petition date. Scott then also
argues that counts XIX–XXIV should be dismissed for essentially the same reason as the other
fraudulent transfer counts: the property that was transferred was not property of the Debtor
(either because it was corporate property or because any recovery would now inure to the benefit
of Elizabeth Wolf due to the marital division), and in the case of section 549 count (Count
XXIV), the property transferred post-petition (if any) was not, as a matter of law, estate property.

Thus, Scott Wolf has asked this court for a final judgment as a matter of law in his favor
on Counts 1–9, 12–14, and 19–24. Scott Wolf has therefore consented to the entry of final
judgment on those counts. *In re Clean Burn Fuels, LLC*, 540 B.R. 195, 199 n.2 (Bankr.
M.D.N.C. 2015); *In re Carter*, 506 B.R. 83, 88–89 (Bankr. D. Ariz. 2014); *In re Pearlman*, 515
B.R. 887, 892 n.21 (Bankr. M.D. Fla. 2014). This court may statutorily and constitutionally enter
final judgment on all counts as against Scott Wolf.[12]

---

[12] Counts 10–11 and 15–18 (dealing with Michael Wolf's discharge) do not implicate Scott Wolf. In any
event, those counts are statutorily and constitutionally core irrespective of litigant consent.

Michael Wolf filed a motion for summary judgment arguing substantially the same things as Scott Wolf, in addition to arguing that the counts aimed at denying him his discharge fail to state a claim as a matter of law. *See* Michael Wolf's Mot. Summ. J., Docket No. 589. Thus, he is deemed to have consented to final judgment on all counts except for Counts 10–11.[13] *Clean Burn*, 540 B.R. at 199 n.2; *Carter*, 506 B.R. at 88–89; *Pearlman*, 515 B.R. at 892 n.21.

Zig Zag and ZZC were served with summons indicating in clear terms that a failure to respond would result in their implied consent to this court entering final orders; they never filed an answer in this case and are not represented by legal counsel. A final judgment may be entered against them. *See In re Oldco M Corp.*, 484 B.R. 598, 614–15 (Bankr. S.D.N.Y. 2012); *In re Hoku Corp.*, 2015 WL 8488949, at *2-3 (Bankr. D. Idaho Dec. 10, 2015).

MMQB, Inc., Hound Ventures, and SHBM first filed an answer indicating their lack of consent to bankruptcy court adjudication. To this court's knowledge, they never filed a motion for summary judgment or any other dispositive motion asking for a final judgment that would repudiate that initial withholding of consent. They are not now represented by counsel. No final judgment will be entered *against* Hound Ventures and SHBM at any rate; the business was never transferred to them (per the complaint), and the factual material in the record is not sufficient to allow a judgment to be liquidated against them based upon their receipt under section 550(a)(2) of the proceeds/products/profits of the MMQB business.

MMQB, Inc., owing to the trustee's alter ego theory and his fraudulent transfer theories, however, would be held liable by this court as a subsequent transferee of the business. Given MMQB, Inc.'s lack of consent, however, the alter ego *Stern* claim (which is absolutely vital to

---

[13] In any event, Counts 10–11 run against ZZC only and are core irrespective of litigant consent.

the success of the trustee's fraudulent transfer theory pinning liability on MMQB, Inc.) cannot be

finally adjudicated as against it so as to support a final judgment.

Hence, final judgment will be entered on all counts. The only exception to this is with

respect to Count I and Counts VII–IX *as to* MMQB, Inc. (which withheld consent and then did

not file any motion for entry of a final judgment in its favor), for which the court will issue

proposed findings of fact and conclusions of law per Fed. R. Bankr. P. 9033. *See Exec. Benefits

Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2172–74 (2014); 28 U.S.C. § 157(c)(1).

## II.    Legal Standard

There is a two step process for obtaining a default judgment. *VLM Food Trading Int'l,

Inc. v. Illinois Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016); *In re Catt*, 368 F.3d 789, 793 (7th

Cir. 2004). First, the party against whom default judgment is sought must be held in default.

*Catt*, 368 F.3d at 793. Certain of the Defendants in these cases have been held in default as a

sanction for having failed to comply with discovery orders. *See* Order, Docket No. 566; Opinion,

Docket No. 574; Order, Docket No. 575; Fed. R. Civ. P. 37(b)(2)(A)(vi); Fed. R. Bankr. P. 7037.

"The basic effect of an entry of default (step one) is that [u]pon default, the well-pleaded

allegations of a complaint relating to liability are taken as true." *VLM Food*, 811 F.3d at 255

(quoting *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th

Cir. 1983)).

Next, an actual default judgment must be entered. The entry of default alone does not

establish an entitlement to relief. *VLM Food*, 811 F.3d at 255 (noting that the entry of default

does not determine rights). It merely denies the party held in default the opportunity to contest

any of the facts properly alleged in the complaint. *See In re Fundakowski*, 557 B.R. 268, 269

(Bankr. D.R.I. 2016). The Plaintiff must, however, establish that the well-pleaded facts found in

the complaint, if taken as true, amount to a legally cognizable claim for relief upon which a

judgment may be entered. *See Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F.2d 1200, 1206

(5th Cir. 1975) (citing and discussing *Thomson v. Wooster*, 114 U.S. 104 (1884)). Thus, even

after entry of a default, the defaulted Defendant may attack the sufficiency of the complaint.

*Matter of Hunt's Health Care, Inc.*, 161 B.R. 971, 979 (Bankr. N.D. Ind. 1993).[14]

The standard to be applied is essentially the same as that employed when evaluating a

complaint based on a motion to dismiss under Rule 12(b)(6). *See Surtain v. Hamlin Terrace

Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015). Unlike in the pleading stage of litigation,

however, a judgment may not be entered based on inconsistent theories of relief. *See, e.g.,

Lawson v. Life of the S. Ins. Co.*, No. 4:06-CV-42 (WLS), 2008 WL 11342635, at *3 (M.D. Ga.

June 19, 2008); *see also Fredonia Broad. Corp. v. RCA Corp.*, 481 F.2d 781, 801 (5th Cir.

1973); *In re Stangel*, 2018 WL 4945692, at *1 (Bankr. E.D. Wis. Oct. 10, 2018). These

principles apply with equal weight even where a default judgment is sought as a discovery

sanction under Rule 37 and not for failure to defend. *See Microsoft Corp. v. Computer Care Ctr.,

Inc.*, No. 06-CV-1429 SLT, 2008 WL 9359718, at *5 (E.D.N.Y. Apr. 8, 2008); *see also Parlier

v. Casteen*, No. 514CV00085RLVDCK, 2016 WL 3032692, at *1 (W.D.N.C. May 26, 2016).

Additionally, where, as here, the damages sought are not for a sum certain, the Plaintiff

must provide evidence as to the appropriate amount of damages. *Catt*, 368 F.3d at 793. A hearing

is not always necessary, and, in light of the detailed evidence presented in support of the

damages sought in this case, the court determines that a hearing on damages is not required in

this case, since the evidence submitted allows for a definite computation of damages to be made.

*See Domanus v. Lewicki*, 742 F.3d 290, 304 (7th Cir. 2014); *Dundee Cement*, 722 F.2d at 1323;

---

[14] Some of the defaulted Defendants have, of course, vigorously contested the legal sufficiency of the
trustee's complaint in these proceedings, as well as the trustee's standing and authority to bring the causes
of action being brought.

*Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989) ("While it is true . . . that

the damages in this case were neither liquidated nor capable of mathematical calculation, it was

not necessary for the [lower court] to hold a hearing, as long as it ensured that there was a *basis*

for the damages specified in a default judgment.") (emphasis added); Fed. R. Civ. P. 55(b)(2). In

any event, no defaulted Defendant has formally requested a hearing on the damages amount, and

the court therefore deems any argument to the effect that a hearing is required to have been

forfeited and/or waived.

In sum, it follows that if the judgment sought is supported by a legally sufficient

complaint and if the damages sought are supported by appropriate evidence, a default judgment

may be entered for the amount(s) requested.

### III.     The Trustee's Standing/Authority

### a.    The Family Court Property Division

The trustee's standing and/or authority to bring these causes of action is at the heart of

this case. The Wolfs (Scott and Michael) first argue that the issuance of a divorce ruling dividing

the marital property of Elizabeth and Michael Wolf precludes the trustee from maintaining these

causes of action. It does not.

Illinois is a common law property state. *See In re Marriage of Evans*, 426 N.E.2d 854,

857 (Ill. 1981). During the marriage, each spouse has the legal right to deal with his/her own

property in whatever manner he/she deems fit. 750 ILCS § 65/9; *Kujawinski v. Kujawinski*, 376

N.E.2d 1382, 1387 (Ill. 1978); *People v. One 1990 Chevrolet Suburban, VIN

1GNER16K7LF1628*, 605 N.E.2d 92, 94 (Ill. App. Ct. 1992). That is, for example, if one spouse

owns stock in a corporation, the other spouse has no interest, legal or equitable, in the stock

merely by virtue of being the stock owner's spouse.

Upon the filing of a divorce petition, however, the concept of marital property becomes key. *See* 750 ILCS § 5/503(a) (defining marital property). If, at the time of the divorce petition, one spouse owns property that is also marital property, then his/her independent ownership ceases, and each spouse acquires a contingent interest in the property. *See* 750 ILCS § 5/503(e); *In re Thorpe*, 881 F.3d 536, 539–40 (7th Cir. 2018). "When the divorce court eventually divides marital property, the obtaining spouse's contingent interest in that property ripens into a full ownership interest. Conversely, the spouse who is not awarded the property sees his contingent interest vanish." *Thorpe*, 881 F.3d at 540.

In this case, Elizabeth Wolf (Michael Wolf's then-wife) filed a divorce petition in December of 2013. In July of 2014, Michael Wolf filed for bankruptcy. In late 2017, the family court judge divided the marital property 100% in favor of Elizabeth Wolf.[15] Hence, it follows that any marital property Michael Wolf owned on the divorce-petition date that was divided in favor of Elizabeth Wolf no longer belongs to the bankruptcy estate.[16]

This court does not know exactly which marital property was owned by Michael and Elizabeth Wolf in late 2013 that would have been subject to the family court's property division award. Helpfully, however, the family court has provided a description in its final judgment dissolving the Wolf marriage:

> [Elizabeth Wolf] is awarded the marital estate, comprised of Respondent's 49% interest in Zig Zag Corporation, the proceeds from the sale of the marital home in Highland Park, the proceeds from the sale of the home in New Mexico, the proceeds from the sale of the lot in New Mexico, the Fiat automobile, the Mercedes Benz [Elizabeth Wolf] drives.

---

[15] The automatic stay was lifted to allow the family court to do this. *See* 11 U.S.C. § 362(b)(2)(iv); Order Granting Mot. Relief from Stay, Docket No. 53, 14bk27066, at 2.

[16] This is because the bankruptcy estate succeeded only to whatever property interests the Debtor had on the petition date, which, as concerns marital property, would have been only his contingent interest in the marital property. *See Thorpe*, 881 F.3d at 539.

*See* Michael Wolf's Mot. Summ. J., Docket No. 597, Ex. A, at 3.

The family court's pertinent findings and rulings, which preceded the entry of final judgment, do not contradict this language:

> Mr. Wolf asserts no interest in any marital assets and assigns any interest that he might have in Zig Zag Corporation, the proceeds from the sale of the marital home in Highland Park, the proceeds from the sale of the home in New Mexico, the proceeds from the sale of the lot in New Mexico, a Fiat automobile, the Mercedes Benz that Mrs. Wolf drives, his forty-nine per cent (49%) interest in Zig Zag Corporation and any claim that he has arising out of the bankruptcy proceeding (he has a rather substantial counter claim on file) to Mrs. Wolf.

*See* Michael Wolf's Mot. Summ. J., Docket No. 597, Ex. B, at 8.[17]

The court then goes on to say, more or less, that it will indeed award those properties to Mrs. Wolf to the extent that it can do so given the pending bankruptcy case. *Id.* Of course, Michael Wolf had no ability to "assign" anything to Elizabeth Wolf; he simply had no property to transfer (his property, including his contingent interests in the marital property, had long since become property of the estate under section 541). But the stay had been lifted to allow the *family court* to make a property division, which it did. That the family court made the division based on Michael Wolf's offer is of no moment in these proceedings.[18]

As pertinent to this proceeding, then, the estate owns 51% of the equity in Zig Zag Corporation and 49% of the equity in ZZC. This court does not see how the estate's loss of 49% of the equity in Zig Zag Corporation to Elizabeth Wolf affects the trustee's ability to bring any of

---

[17] True, the court first begins by saying that Mr. Wolf "assigns *any* interest that he might have in Zig Zag Corporation," but then goes on to say "his forty-nine per cent (49%) interest in Zig Zag Corporation." This potentially creates an ambiguity, but the language is unambiguous when reconciled with the language of the final judgment, which clearly states "49% interest in Zig Zag Corporation."

[18] If there were other marital property that could or should have been divided by the family court, that is an issue to be raised by the parties in state court. Since this court lifted the stay to allow the family court to divide the marital property, it is not in a position to decide *what the marital property was or is* under 750 ILCS § 5/503(a) and must proceed solely based on the description given by the family court in its final judgment and preceding findings/rulings. This deference to the state court is especially appropriate in the family law context. *See, e.g.*, *Barber v. Barber*, 62 U.S. 582, 584 (1858).

the causes of action he is currently bringing. As seen below, many if not most of the trustee's

causes of action are not strictly derivative of the Debtor's pre-petition property rights in any

event. If Elizabeth Wolf believes that the marital property division in her favor allows her to

assert an ownership interest or other property interest in any recovery gained by the trustee on

any cause of action asserted in these proceedings, she is free to make that argument to this court.

Otherwise, any proceeds actually recovered from these causes of action will be distributed to the

estate's creditors, with any surplus going to the Debtor. *See* 11 U.S.C. §§ 541(a)(1), (3), (7),

726(a).[19]

### b.  The Trustee's Statutory Authority to Bring these Causes of Action

The question raised by the Wolfs in these proceedings is not so much one of "standing"

or justiciability as one of the trustee's authority under the Bankruptcy Code to bring the causes of

action that he asserts. *See Grede v. Bank of New York Mellon*, 598 F.3d 899, 900 (7th Cir. 2010)

("Whether a given action is within the scope of the Code is a question on the merits rather than

one of justiciability."). This court will therefore discuss the trustee's statutory authority.

The trustee must look to the Bankruptcy Code alone for his authority to bring a cause of

action. First, and most easily, certain sections of the Code, such as sections 547, and 548, give

the trustee direct authority to prosecute the causes of action described in those sections. *See* 11

U.S.C. §§ 547, 548.

---

[19] Of course, it is to be remembered that there is a fundamental legal distinction between having a
proprietary interest in an asset and having a claim or right to payment against or from the legal person
who owns that asset. Whether Elizabeth Wolf has a proprietary interest in any recovery realized by the
trustee (and to what extent), and/or whether she has a "claim" against this bankruptcy estate (and to what
extent), are questions that have not yet been ruled upon with any finality by this court, except to say that
the award of 51% of Zig Zag Corporation to Elizabeth Wolf, or the award of any of the other property
actually awarded by the family court, does not undercut the trustee's standing or authority to bring the
causes of action asserted in this adversary proceeding.

Second, sections 541(a)(1) and 323 allow the trustee to assert pre-petition causes of action belonging to the debtor on the petition date. *See Matter of Geise*, 992 F.2d 651, 655 (7th Cir. 1993) (noting that section 541(a)(1) includes causes of action owned by the Debtor). The trustee's rights under section 541(a)(1) are by definition no greater than the debtor's; thus, for instance, the trustee cannot succeed on a section 541(a)(1) cause of action where the debtor would necessarily have failed. *See Bank of Marin v. England*, 385 U.S. 99, 101 (1966); *Zartman v. First Nat. Bank of Waterloo*, 216 U.S. 134, 135 (1910); *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 596 (7th Cir. 2012); *In re Graham Square, Inc.*, 126 F.3d 823, 831 (6th Cir. 1997); *Matter of Sanders*, 969 F.2d 591, 593 (7th Cir. 1992); *In re Cent. Illinois Energy Coop.*, 526 B.R. 786, 792 (Bankr. C.D. Ill. 2015) ("A trustee's rights under section 541 are derivative of those held by the debtor."), *aff'd*, No. 15-1118, 2016 WL 299007 (C.D. Ill. 2016); *In re Marston*, 417 B.R. 766, 770 (Bankr. N.D. Ill. 2009) ("Thus, under 11 U.S.C. § 541, the trustee of a bankrupt debtor may bring any cause of action that the debtor could have brought under state law as of the commencement of the case."). This is important because, as seen below, if the trustee's only basis for disregarding Zig Zag Corporation's corporate form is section 541(a)(1) and the Debtor's right to do so, then his alter ego claim will fail as regards Zig Zag. *See In re Rehab. of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018–19 (Ill. 1994) (repudiating the notion that under Illinois law the corporate form may be disregarded at the behest of the corporation or its shareholder(s); noting that the right to do so under Illinois law belongs to third-party creditors (which would include the bankruptcy trustee *when the trustee is imbued with creditor status and not merely debtor-derivative status* under the Bankruptcy Code)).

Third, section 544(b) allows the trustee to assert any state law avoidance action that is exercisable or that could have been exercised by a creditor holding an allowable unsecured

claim. *See* 11 U.S.C. § 544(b). Under section 544(b), the trustee's rights are derivative not of the

debtor, but rather of the debtor's creditors. *Hays & Co. v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.*, 885 F.2d 1149, 1155 (3d Cir. 1989) ("Claims asserted by the trustee under section

544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the

trustee to assert on their behalf."). If those creditors would succeed under state law on the

avoidance cause of action, so may the trustee.

Fourth, section 544 authorizes the trustee to assert any cause of action based on a general

injury to the debtor's creditors; that is, the trustee may assert a cause of action derivatively of

creditors' rights to do so if the allegations "could be asserted by any creditor." *See Fisher v.*

*Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) (quoting *Koch Refining v. Farmers Union Central*

*Exchange, Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987)).

> If the liability is to all creditors of the corporation without regard to the personal
> dealings between such officers and such creditors, it is a general claim....
>
> A trustee may maintain only a general claim. His right to bring a claim depends on
> whether the action vests in the trustee as an assignee for the benefit of creditors or,
> on the other hand, accrues to specific creditors.

*Id.* at 879–880 (quoting *Koch*, 831 F.3d at 1348–49).

A claim is personal and not general where "the claimant is harmed and no other claimant

or creditor has an interest in the cause." *Id.* at 879. Thus, if a creditor claim is *not* personal, it

may be brought by the trustee for the benefit of the entire creditor body.

This fourth basis of trustee authority has been strongly criticized. See *In re Greater*

*Southeast. Cmty. Hosp. Corp.*, 333 B.R. 506, 517–21 (Bankr. D.D.C. 2005); *In re Miller*, 197

B.R. 810, 814–15 (W.D.N.C. 1996). The courts in both *Greater Southeast* and *Miller* opined that

the Seventh Circuit's decision in *Steinberg v. Buczynski*[20] effectively overruled *Koch Refining*'s

---

[20] 40 F.3d 890 (7th Cir. 1994).

holding that claims belonging to creditors generally may be brought by the trustee in bankruptcy.
*Greater Southeast*, 333 B.R. at 519; *Miller*, 197 B.R. at 813 n.4.

Nevertheless, because the holding and reasoning of *Koch Refining* was cited and quoted

with approval both in *Apostolou* and more recently in *In re Teknek, LLC*,[21] this court will apply it

in this case. This point is important because the trustee's abstract legal ability to recover the

allegedly fraudulent transfers in this case depends on his ability to treat Zig Zag Corporation as

the alter ego of Michael Wolf under Illinois law at the time of the transfers from Zig Zag

Corporation to ZZC. Illinois law apparently does not allow the corporate form to be disregarded

by a shareholder of the corporation;[22] thus, if the trustee's right to disregard Zig Zag's corporate

form is derivative *only of* the Debtor-shareholder's right to do so under Illinois law based on

section 541(a)(1), the trustee must lose. *See, e.g.*, *In re Howland*, 579 B.R. 411, 416–17 (E.D.

Ky. 2016) (noting the distinction between asserting a reverse-piercing or alter ego claim based

on the *rights of the debtor* under section 541 and asserting such a claim based on the *rights of

creditors* under section 544).

If, on the other hand, he can step into the shoes of Michael Wolf's general creditors

under section 544 and the rationale of *Koch Refining*, he may disregard the corporate form of Zig

Zag Corporation under Illinois law based on *the creditors'* right to do so and thus treat Zig Zag's

property as Michael Wolf's for the purposes of asserting fraudulent transfer Counts V–IX and

recovering the value of the MMQB business.[23]

---

[21] 563 F.3d 639, 645–47 (7th Cir. 2009).

[22] *See In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018 (Ill. 1994) ("[T]he general law mandates that the piercing of a corporate veil must never be made for the benefit of the corporation *or its shareholders*.") (internal quotations and citations omitted) (emphasis added).

[23] As seen below in Part VI.a, the court's focus on Zig Zag Corporation is due to the very uncertain state of Illinois and Delaware law in this area and the close resemblance of the trustee's "alter ego" claim to a "reverse veil-piercing" claim, with some courts, most prominently the court in *In re Glick*, noting that reverse piercing is not generally accepted at all, whether based on the piercing claim of a shareholder of

IV.    The Complaint – Factual Background

The court now turns to the well-pleaded allegations in the complaint, which are central to the analysis, and which it will describe largely in its original order to the extent possible. The story generally is one of a web of artificial legal entities, all alleged to have been used as part of an elaborate scheme to defraud Michael Wolf's creditors, most prominently his then-wife Elizabeth Wolf, by transferring the family business out of a corporation owned and controlled by Michael Wolf to an entity (or entities) owned and controlled by his sons, most prominently Scott Wolf. According to the allegations in the complaint, the family business was transferred from an entity known as Zig Zag to one by the name of ZZC and then ultimately came to rest in an entity known as MMQB, Inc. (owned and controlled by Scott Wolf), with the proceeds of the business then being funneled to various persons, including the Debtor, through the use of other, separate corporate entities. The court first begins with a general description of the parties, and then it moves into the narrative provided by the complaint.

Michael, Scott, and Peter Wolf all allegedly reside with one another in Washington state. Trustee's Amended Complaint, Docket No. 95, at ¶¶ 15–17. Zig Zag is an Illinois corporation

the corporation ("insider" reverse piercing) or of the shareholder's creditors ("outsider" reverse piercing). Due to that uncertainty in state law, the court finds it appropriate to err on the side of caution and treat *only* Zig Zag Corporation as Michael Wolf's alter ego under Count I of the complaint due to the fact that there is no doubt in the allegations that Michael Wolf owned 100% of the stock in Zig Zag Corporation at all relevant times and, as is especially important, at the time of the allegedly fraudulent transfer of the corporation's assets to ZZC. The same cannot be said of ZZC, especially at the time of the alleged transfer of ZZC's assets to MMQB, Inc. As for MMQB, Inc., that corporation was *never* owned by Michael Wolf, and this court can discover no Delaware cases (MMQB, Inc. is a Delaware corporation) indicating that a corporation may be treated as the alter ego of someone who owns no shares in that corporation in the manner in which the trustee seeks to use the doctrine (*i.e.*, to collapse the separate legal personalities such that the property of one is simply the property of another). Thus, of the three entities that at one time allegedly owned the MMQB business (and which were either transferors or transferees of that business), which business is at the heart of these proceedings, only Zig Zag corporation has its corporate form disregarded below in Count I. The rest of the corporations, for the purposes of resolving this action, are deemed to enjoy their separate existence under state law.

incorporated in 1987, and at all relevant times Zig Zag was 100% owned by Michael Wolf (the Debtor). *Id.* at ¶ 18.

Illinois ZZC, Inc. (ZZC IL) "is an Illinois corporation incorporated on December of 2011." *Id.* at ¶ 19. It was 100% owned by Michael Wolf during the relevant time periods in this case. *Id.* Delaware ZZC, Inc. (ZZC DE) "is a Delaware corporation also incorporated in December of 2011." *Id.* at ¶ 20. It was also 100% owned by Michael Wolf during the relevant time periods in this case. *Id.*

MMQB, Inc. "is a Delaware corporation incorporated in 2014." *Id.* at ¶ 21. Scott Wolf, not Michael, was and is the sole officer, director, and shareholder. *Id.*

Hound Ventures, Inc. (Hound Ventures) is also a Delaware corporation, having been incorporated in 2014 (shortly after MMQB, Inc.). *Id.* at ¶ 22. Scott Wolf is also the sole officer, director, and shareholder of this corporation. *Id.*

SHBM, Inc. (SHBM) "is a Delaware corporation incorporated in 2009." *Id.* at ¶ 23. This corporation is also solely owned and managed by Scott Wolf. *Id.*

Melissa Skolnick[24] is Scott Wolf's girlfriend and allegedly resides with Scott Wolf in Washington state. *Id.* at ¶ 24. Melissa Skolnick received, in 2014, $250,000 or more (all attributable to the MMQB business) from an entity called "Four Legs, Inc." (Four Legs), a Delaware corporation incorporated in 2010. *Id.* at ¶ 25.

Finally, Ma Cherie LLC (Ma Cherie) is a business entity organized under the laws of Montana in 2014. *Id.* at ¶ 26. It was formed by Michael and Scott Wolf "in order to purchase a custom Aston Martin owned by the Debtor." *Id.* Scott Wolf is the sole member of Ma Cherie, and the entity's existence has been based entirely around the Aston Martin. *Id.*

---

[24] This description of the complaint does not in any way bind parties, such as Melissa Skolnick, who have not been held in default.

As alleged, this adversary proceeding primarily concerns Michael Wolf's (the Debtor) fraudulent transfer of a business prior to the petition date to his sons, Scott and Peter Wolf. *Id.* at ¶ 1. "The purpose of the transfer was to remove the Debtor's interest in the business from the reach of his creditors including, but not limited to, his wife, in anticipation of their impending divorce." *Id.*

This business is a "trade publication for the commercial furniture industry," named the Monday Morning Quarterback (MMQB), published by facsimile, e-mail, and the internet to varying degrees as technology advanced. *Id.* at ¶ 2. Michael Wolf started MMQB in the 1980s. *Id.* at ¶¶ 27–29. From 1987 to 2011, the business's income was attributed to one of the Defendants, Zig Zag Corp. (Zig Zag), "an Illinois corporation wholly owned by the Debtor." *Id.* at ¶¶ 3, 18, 33–34. MMQB had income of over $1,000,000 by 2010–11. *Id.* at ¶¶ 3, 37.

Though the income belonged (at least for tax purposes) to Zig Zag, Michael Wolf used that income to pay his and his family's personal creditors hundreds of thousands of dollars, in addition to paying himself a "lavish salary," *id.* at ¶¶ 4, 35, and in addition to paying his sons a salary for work performed on behalf of the business, *id.* at ¶ 36. The expenses paid on behalf of his family included the Debtor's credit card bills as well as those of Elizabeth, Scott, and Peter Wolf. *Id.* at ¶ 38. This income was not reported on the Debtor's or his sons' tax returns. *Id.* at ¶ 39. The business remained very profitable and, up through late 2011, the entire Wolf family "benefitted handsomely from the income it generated." *Id.* at ¶ 5.

This changed in 2011 when Michael and Elizabeth Wolf's marriage "began to fall apart," with Michael Wolf moving out of the marital residence. *Id.* at ¶ 6. Around this time, Michael Wolf began taking action to transfer his interest in the MMQB business to others, the design

being to prevent Elizabeth Wolf and other creditors from reaching it and its value. *Id.* at ¶¶ 7, 43–44.

Specifically and importantly, Michael Wolf caused the transfer of the MMQB business from his wholly owned and controlled entity (Zig Zag) to entities owned and/or controlled by Scott Wolf, including two defaulted Defendants in this proceeding, MMQB, Inc. (not to be confused with the underlying MMQB "business," which has allegedly changed hands between corporate entities multiple times) and Hound Ventures, Inc. *Id.* at ¶ 8. The Debtor still enjoys the fruits of MMQB's income, as it continues to fund his living and legal expenses. *Id.* at ¶ 9.

Michael Wolf and/or his sons created two entities named ZZC, one an Illinois Corporation and the other a Delaware Corporation. *Id.* at ¶¶ 45–46. In 2012, income from the MMQB business (presumably derived from accounts receivable owed on account of subscription agreements and/or advertising agreements) ceased being attributed to Zig Zag and began to be attributed to, and deposited into the accounts of, ZZC. *Id.* at ¶ 47. The court takes this to mean that there was an effective, if perhaps informal, assignment of Zig Zag's receivables (intangible rights to payment arising from the subscription/advertising agreements) to ZZC in 2012.

No consideration was ever received by Zig Zag for this transfer. *Id.* at ¶ 48. The Debtor, according to ZZC's 2012 tax return, owned 100% of the stock of ZZC. *Id.* at ¶ 49. The substance of the business did not change; Michael, Elizabeth, Scott, and Peter Wolf all continued to perform in their former roles. *Id.* at ¶ 50. Just as with Zig Zag, Michael Wolf disregarded the corporate formalities and used ZZC's income to pay his and his family's personal creditors. *Id.* at ¶ 51.

As discussed above, Michael and Elizabeth's marriage began breaking down in 2011. On December 5, 2013, Elizabeth Wolf filed a petition for divorce in Lake County, Illinois. *Id.* at ¶

24

52. Shortly thereafter, ZZC's Board of Directors (Michael and Scott) fired Elizabeth from ZZC (she had previously handled advertising for the business). *Id.* at ¶ 54. Michael Wolf was then also fired by ZZC, *id.* at ¶ 55–56, in an attempt to make it appear as though he had no income to pay to Elizabeth Wolf for temporary support and maintenance, *id.* at ¶ 55–57. Around that time, Michael Wolf also issued a promissory note to ZZC in the amount of $128,781.73. *Id.* at ¶ 58.

As noted above, the Debtor claimed to own 100% of ZZC's stock on his 2012 tax return. During the divorce proceedings, and in his bankruptcy schedules (and in testimony to the bankruptcy court), he claimed, however, to own only 49% of ZZC's shares, the other 51% belonging to Scott Wolf. *Id.* at ¶ 60–61. To the court, one of four plausible things may have happened. Scott Wolf could have owned 51% of the stock from the beginning, and Michael lied on his tax return. Second, Michael could still own 100% of ZZC, and he simply lied to the family court and to the bankruptcy court. Third, Michael could have transferred 51% of the stock to Scott at sometime between 2012 and the date that he filed his bankruptcy petition. Fourth, Michael (and/or Scott) could have caused ZZC to issue new shares to Scott such that Scott would own 51% of the company. Scott Wolf, at any rate, never paid anything for his interest in the company, to the extent that he in fact does have an interest in the company. *Id.* at ¶ 63. Moreover, the income of the business, regardless of ownership, continued to go to Michael Wolf either directly or indirectly, such as when ZZC paid for Michael Wolf's apartment in Chicago. *Id.* at ¶ 65–66.

In January of 2014, around the time of the divorce petition, Michael and/or his sons formed and incorporated MMQB, Inc. *Id.* at ¶¶ 67–68. Scott Wolf is listed as the sole director of MMQB, Inc., and Scott Wolf has claimed that he elected himself as all of the officers of MMQB, Inc. *Id.* at ¶¶ 69–70. Scott Wolf owns all of the shares of MMQB, Inc., which he purchased for

$7.51. *Id.* at ¶ 71. Around January of 2014, ZZC transferred its receivables to MMQB, Inc. *Id.* at ¶ 73. No purchase agreement exists for either the assets of ZZC or its stock. *Id.* at ¶¶ 74–75.

The Wolfs incorporated another entity in February of 2014: "Hound Ventures." *Id.* at ¶ 77. Scott Wolf claims to be the sole director, officer, and shareholder of the entity. *Id.* at ¶ 78. Peter Wolf claims to be an employee of Hound and receives a salary many times larger than that which he received at Zig Zag or ZZC. *Id.* at ¶¶ 80–81. Nominally at least, Hound Ventures has provided services to MMQB, Inc., for which it has received hundreds of thousands of dollars in compensation from MMQB, Inc. *Id.* at ¶¶ 82–84. The facts alleged, such as that MMQB, Inc. had an "infinite amount of time" to pay Hound Ventures, tend to show that this arrangement did not reflect the economic substance of the two entities' commercial relationship with one another (*i.e.*, MMQB, Inc. was funneling money to Hound Ventures). *Id.* at ¶¶ 84-89. In 2014, MMQB, Inc. transferred approximately $300,000 of income attributable to the underlying MMQB business to Hound Ventures. *Id.* at ¶ 90. Part of that money went to Scott Wolf. *Id.* at ¶¶ 91–92. MMQB, Inc. was Hound Ventures' sole source of income. *Id.* at ¶ 93.

Going back in time, Michael Wolf and his sons incorporated another entity in September of 2009: "SHBM." *Id.* at ¶¶ 94–95. Scott Wolf is allegedly the sole director, officer, shareholder, and employee of SHBM. *Id.* at ¶ 96. Much in the same fashion as with Hound Ventures, Scott Wolf arranged for MMQB, Inc., to pay SHBM "whatever was necessary to be charged" in order to publish the MMQB publication, and through such arrangement caused the transfer of hundreds of thousands of dollars from MMQB, Inc. to SHBM, which was then largely transferred to Scott Wolf's girlfriend, Melissa Skolnick. *Id.* at ¶¶ 98–104. These transfers to Melissa Skolnick were carried out through an intermediary entity known as "Four Legs." *Id.* at ¶¶ 105–112.

During the divorce proceedings, Michael Wolf was ordered to sell his Aston Martin to pay Elizabeth Wolf's attorneys' fees. *Id.* at ¶ 115. Scott Wolf created an entity, "Ma Cherie," which then purchased the car and in turn sold it to a car-dealership and then re-purchased it from the same. *Id.* at ¶¶ 116–121. Michael Wolf never turned over the proceeds of the sale and was held in contempt by the family court. *Id.* at ¶¶ 123–124. Michael Wolf then filed for bankruptcy rather than face jailing for his contempt. *Id.* at ¶¶ 124–126.

As of the filing of the bankruptcy, The Debtor owed and owes the IRS, credit card companies, and Elizabeth Wolf over $1,000,000, and the largest creditor is Elizabeth Wolf.[25] *Id.* at ¶ 127. During the bankruptcy, Michael Wolf hindered the trustee's attempts to sell the marital home by disseminating and publishing defamatory, derogatory, and threatening e-mails and flyers. *Id.* at ¶ 132.

Michael Wolf's sons and/or the entities described above have provided Michael Wolf with funds to pay for legal expenses, for which Michael has created and signed promissory notes. *Id.* at ¶¶ 133–37. Those funds are attributable to the MMQB publication/business. *Id.* at ¶¶ 138–40.

With the complaint's general allegations having been laid out, the court now turns to the legal sufficiency of those allegations. Do they, in conjunction with the specifically pleaded material in each count, suffice to support the entry of default judgments against the named Defendants?

## V.      The Rule 9(b) Arguments

The Wolfs make arguments premised on Civil Rule 9(b), which generally requires fraud to be pleaded with particularity. As a default judgment may only be entered based upon well-

---

[25] As noted above, there is a lingering question as to whether Elizabeth Wolf is a creditor of the estate and to what extent.

pleaded facts, it stands to reason that a judgment may not be entered upon a fraud-based count if

the pleading runs afoul of Rule 9(b).

In the context of fraudulent transfers, the Rule applies to constructive and actual fraud. *In*

*re Glick*, 568 B.R. 634, 657 (Bankr. N.D. Ill. 2017) (citing *General Elec. Capital Corp. v. Lease*

*Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997)).

> To plead an actual or constructive fraud with the necessary particularity, the
> complaint must allege what (or how much) was transferred, when the transfer was
> made, how it was made, who made it, who received it, and under what
> circumstances.

*Glick*, 568 B.R. at 657 (internal quotations omitted).

It is to be remembered that the rule is relaxed where a bankruptcy trustee is the plaintiff.

*Allegaert v. Perot*, 78 F.R.D. 427, 430 (S.D.N.Y. 1978); *In re DBSI, Inc.*, 445 B.R. 351, 355

(Bankr. D. Del. 2011); *In re Hearthside Baking Co., Inc.*, 402 B.R. 233, 255 (Bankr. N.D. Ill.

2009); *In re 1031 Tax Grp., LLC*, 420 B.R. 178, 190–91 (Bankr. S.D.N.Y. 2009). The same is

true where specific information is peculiarly within the adverse parties' knowledge. *In re Potter*,

88 B.R. 843, 847 (Bankr. N.D. Ill. 1988); *In re First Merchants Acceptance Corp. Sec. Litig.*,

No. 97 C 2715, 1998 WL 781118, at *8 (N.D. Ill. Nov. 4, 1998).

Here, the plaintiff is a bankruptcy trustee, asserting claims based on violations of third

parties' legal rights (rights either of the Debtor or of his creditors). Also, all of the alleged

transfers took place between family members and those family members' closely held

corporations (thus indicating that specific knowledge regarding the particulars of the transfers

would neither be generally known nor readily discoverable by outsiders). Those defendants' lack

of cooperation in discovery has been at the heart of these proceedings. Thus, the court will not

strain to apply Rule 9(b) rigorously against the trustee.

With those qualifications in mind, Rule 9(b) is met in this case. There are essentially three transfers alleged. First, there is the allegation that the MMQB business was transferred from Zig Zag Corporation to ZZC at a time when both corporations were wholly owned by the Debtor. The MMQB business has been described in the complaint in some detail. This transfer was allegedly made sometime in early 2012. Again, it was made by Zig Zag corporation to ZZC. The circumstances, as alleged, were essentially that the Debtor was attempting to transfer assets between corporations so as to shield them from his then-wife, Elizabeth.

Second, there is the allegation that 51% of the stock in ZZC was transferred by Michael to Scott Wolf no earlier than in 2013, at a time when ZZC still held the MMQB business. The circumstances are the same as for the transfer from Zig Zag Corporation to ZZC (attempting to shield property from the Debtor's then-wife Elizabeth).

Third, the trustee alleges that the MMQB business was transferred from ZZC to MMQB, Inc. roughly in January of 2014. At that time, as alleged, Scott Wolf owned 51% of ZZC and 100% of MMQB, Inc. The circumstances surrounding the transfer were the same: Michael and Scott Wolf were attempting to prevent the business from falling into the hands of Elizabeth.

Finally, and apart from the main transfers of the business itself, there is the multitude of secondary "income" transfers detailed in the complaint. These transfers of income through closely held corporations were, according to the complaint, made in order to allow Michael and Scott Wolf to clandestinely enjoy the fruits of the business.

The complaint alleges fraud with the requisite particularity. The Wolfs' argument to the contrary is rejected.

## VI.    The Legal Theories

### a.  Count I: Alter Ego / Reverse-Piercing

The first count is for declaratory relief. It asks for the court to declare that the assets and income of the "Monday Morning Quarterback" (the business) are property of the estate, no matter which legal personality actually owns the assets of the business, because maintaining the fiction of separate legal personalities for the "sham corporations" described above would sanction a fraud and promote injustice.

Based on a review of the balance of the complaint, the court takes this count to be asking for relief in the form of treating the entity-Defendants as the alter egos of Michael Wolf, and thus disregarding their separate existence apart from him, for the purposes of asserting the substantive legal theories to follow in the complaint (including turnover, constructive/resulting trust, and fraudulent transfer theories); it does not take this count to be asking to hold those entity-Defendants vicariously liable for Michael Wolf's (or the estate's) debts, such as, for example, Michael Wolf's (or the estate's) credit card debt, tax debt, or any debt owed to Elizabeth Wolf. The court finds that the allegations establish that Zig Zag may properly be treated as Michael Wolf's alter ego under Illinois law for the purposes of asserting the substantive legal theories found in the complaint.

State law, pertinently both Illinois and Delaware law,[26] governs the trustee's alter ego theory. This is because the source of substantive law for the trustee's request must, by definition, be either state or federal law, *cf. Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000) (noting that the source of law must, by definition, be either state or federal), and the trustee has *not* asserted any substantive consolidation theory under substantive federal bankruptcy law, *see In re Owens Corning*, 419

---

[26] All alleged transferors/transferees of the MMQB business (Zig Zag, ZZC, and MMQB, Inc.) were Illinois and Delaware corporations.

F.3d 195, 205 (3d Cir. 2005); *In re Clark*, 692 F. App'x 946, 948 (9th Cir. 2017) (noting that

substantive federal law governs a substantive consolidation request).[27]

As a general and fundamental principle, corporations and other artificial legal entities

enjoy a legal personality separate and distinct from that of the equity owners; if an individual

owns even all of the shares of a corporation, that individual does *not*, without more, have an

interest in the property owned by the corporation. *See, e.g.*, *Dole Food Co. v. Patrickson*, 538

U.S. 468, 474–75 (2003); *Bird v. Wilmington Soc. of Fine Arts*, 43 A.2d 476, 483 (Del. 1945);

*Bevelheimer v. Gierach*, 339 N.E.2d 299, 303 (Ill. App. Ct. 1975). Under state law, in

exceptional circumstances this rule may be disregarded "where it otherwise would present an

obstacle to the due protection or enforcement of public or private rights." *Bevelheimer*, 339

N.E.2d at 303. This is sometimes known as veil-piercing. *See Int'l Fin. Servs. Corp. v. Chromas

Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004).

There is, however, a substantive legal distinction between veil-piercing and what is

known as the "alter-ego rule," the latter of which is "the doctrine that *shareholders* will be

treated as the *owners of a corporation's property*, or as the real parties in interest, *whenever* it is

necessary to do so to prevent fraud, illegality, or injustice." *See Alter-Ego Rule*, BLACK'S LAW

DICTIONARY 94 (10th ed. 2014) (emphasis added). As the Seventh Circuit has noted, "[e]fforts to

pierce the corporate veil ask a court to hold A vicariously liable for B's debt . . . . But a

contention that A is B's 'alter ego' asserts that A and B are the *same entity* . . . ." *Elite Erectors,

Inc.*, 212 F.3d at 1038 (emphasis added).

---

[27] Even if the trustee were asserting a substantive consolidation theory under substantive federal law, the Seventh Circuit has never formally endorsed the concept, and, importantly, there are grave issues associated with using the doctrine to draw *non-debtor* entities involuntarily into a bankruptcy proceeding. *See In re Concepts Am., Inc.*, No. 14 B 34232, 2018 WL 2085615 (Bankr. N.D. Ill. May 3, 2018).

The court begins first with Zig Zag, an Illinois corporation (so Illinois law applies). *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 570 (7th Cir. 1985); *cf. Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996) (noting that the substantive law of the state of incorporation governs a veil-piercing case). Illinois courts have noted that "a corporation with only *one stockholder* will be treated as his alter ego. In such cases, the courts will deal with the *substance of the transaction* involved as if the corporate agency *did not exist*," *People ex rel. Hartigan v. Org. Servs. Corp.*, 498 N.E.2d 597, 600 (Ill. App. Ct. 1986) (emphasis added), at least where the corporate fiction has been "used as a protection to fraud or other illegal transactions," *Chicago-Crawford Currency Exch., Inc. v. Thillens, Inc.*, 199 N.E.2d 295, 299 (Ill. App. Ct. 1964); *see also Illinois Interior Finish Co. v. Poenie*, 277 Ill. App. 554, 566 (1934). "[I]f the . . . corporation is merely a dummy or sham, the distinct corporate entity will be disregarded and the [shareholder and corporation] will be treated *as one*." *Dregne v. Five Cent Cab Co.*, 46 N.E.2d 386, 391 (Ill. 1943) (emphasis added).

Importantly, however, the corporate form cannot be disregarded for the benefit of a shareholder. *See In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018 (Ill. 1994) ("[T]he general law mandates that the piercing of a corporate veil *must never be made* for the benefit of the corporation or its shareholders.") (internal quotations and citations omitted) (emphasis added). There is no similar prohibition on disregarding the corporate form at the behest of third-party creditors, however. *See id.* at 1018 (noting that the corporate form is properly disregarded in order to remedy fraud practiced upon third-parties). In other words, under Illinois law, a corporation cannot disregard its own corporate form to reach shareholder assets, and the same logic works in reverse: a shareholder cannot disregard the corporate form of the shareholder's own corporation to reach the corporation's assets.

It is therefore vital in this case to examine into whose shoes the trustee is stepping to
assert the alter ego or reverse veil-piercing claim under state law. For example, in *In re Howland*,
the court was considering the same problem, namely whether the trustee of an individual equity
owner's bankruptcy estate could avoid and recover a fraudulent transfer made by that
individual's wholly owned LLC. *In re Howland*, 579 B.R. 411 (E.D. Ky. 2016). It framed the
issue as one of reverse-piercing, an issue on which it noted courts are "deeply split." *Id.* at 416
(quoting *In re ALT Hotel, LLC*, 479 B.R. 781, 801 (Bankr. N.D. Ill. 2012)).

> There are two recognized types of reverse veil piercing—insider and outsider.
> Insider reverse veil piercing allows a shareholder to disregard the corporation of
> which he is a part for his own benefit.  On the other hand, outsider veil piercing
> occurs where a third-party creditor seeks to reach the assets of a corporation to
> satisfy the debts of a corporate insider.
>
> In this matter, the Trustee could potentially use both insider and outsider reverse
> piercing, each of which are dependent on Kentucky law. First, the Trustee stands
> in the shoes of the Debtors, assuming any causes of action belonging to them. In
> this position, the Trustee can pursue an insider reverse piercing approach if it is
> allowed under Kentucky law. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914,
> 59 L.Ed.2d 136 (1979) ("Whether a particular cause of action is available to the
> debtor, and thus constitutes 'property of the estate,' is determined by state law.").
> Furthermore, under § 544, the Trustee also stands in the shoes of the Debtors'
> judgment creditors and may bring claims available to them. If Kentucky law allows
> such creditors to use outsider reverse piercing, then the Trustee may also use that
> approach. 11 U.S.C. § 544. Since Kentucky has not adopted or rejected reverse veil
> piercing generally, this distinction is not vital to the Court's decision, but it is
> helpful to note in order to interpret the statements of Kentucky courts regarding
> reverse veil piercing.

*Id.* at 416–17 (some internal citations omitted).

Unlike Kentucky law, and as indicated in the discussion above, there is a clear distinction
in Illinois between "insider" alter ego claims and "outsider" alter ego claims. The former are
seemingly impermissible, while the latter *may* be permissible. As the court in *Howland* noted,
however, the trustee can use section 544 to make out an "outsider" alter ego or revere-piercing
claim. And as indicated in Part III.b. above, this court does not believe that the state of the law in
the Seventh Circuit forbids this approach to trustee standing/authority using section 544. There is

nothing to indicate that Michael Wolf's alleged misuse and abuse of the corporate form to

engage in fraudulent transfers with actual intent to hinder, delay, and defraud his creditors would

have, if true, resulted in anything but a general injury to all of his creditors, not a special or

specific injury to any particular creditor or class of creditors. *See Apostolou*, 155 F.3d at 879–880

(quoting *Koch*, 831 F.3d at 1348–49).

With the corporate form capable of being disregarded under Illinois law by the trustee

standing in the shoes of the creditors of Michael Wolf, the only question is whether it may be

disregarded in this case and, if so, disregarded in the manner in which the trustee seeks to

disregard it.

The alter-ego rule as the trustee seeks to apply it, *i.e.*, not to impose vicarious personal

liability but rather to treat the assets of one legal personality as the assets of another at a given

point in time, has found application in bankruptcy cases similar to the one at bar. For example, in

*In re Fisher*,[28] an unpublished decision from the Sixth Circuit, the court had to consider the same

question as that faced by the court here.

In *Fisher*, the debtor was the sole shareholder of a closely held corporation. *Fisher*, 296

F. App'x at 497. The corporation owned inventory. *Id.* at 498. Prior to the petition, the debtor

caused the corporation to transfer its inventory to the debtor's girlfriend, who then sold it on for a

much higher price to a third-party. *Id.* at 497–98. The bankruptcy court, relying on an alter-ego

theory under Ohio law, avoided the transfer from the debtor's closely held corporation to the

debtor's girlfriend under section 548 of the Code. *Id.* at 499. The defendants-appellants argued

that the bankruptcy court had impermissibly reverse-pierced the corporate veil in avoiding the

transfer, since Ohio law did not recognize reverse-piercing, and the bankruptcy court could not

---

[28] 296 F. App'x 494 (6th Cir. 2008).

34

have found that the transfer of the inventory was a transfer of an interest of the *debtor* in property

without having first reverse-pierced the veil of the debtor's wholly owned corporation, which

actually had owned the inventory transferred. *See id.* at 506. As noted by the Sixth Circuit,

relying on one of its own prior cases, which in turn had relied on the Seventh Circuit's *Elite*

*Erectors* case,

> [t]his court, has explained, however, that veil piercing and *alter ego* concepts are
> distinct. The former asks a court to hold A vicariously liable for B's debts, while
> the latter asserts that A and B are the same entity and therefore liability is direct.
> Here, the bankruptcy court found that because [the debtor] and [the corporation]
> were the same entity, [the corporation's] inventory belonged to [the debtor] such
> that the transfer to [the debtor's girlfriend] was a transfer of an interest in property
> of the debtor.

*Id.* (emphasis in original) (internal citations omitted).

In applying the alter ego doctrine as articulated by it above, the court relied on a

statement of substantive Ohio law that "where the stock of a corporation is owned *entirely by one*

*party*, and the party in interest is the stockholder, the fiction of the separate entity of the

corporation may be disregarded where the ends of justice require it." *Fisher*, 296 F. App'x at

505–06 (quoting *Knight v. Burns*, 154 N.E. 345, 346 (Ohio Ct. App. 1926)) (emphasis added).

The Sixth Circuit then affirmed the bankruptcy court's decision that the corporation was

merely the debtor's alter ego under Ohio law and that it therefore did not enjoy a legal

personality separate and distinct from that of the debtor. *Id.* at 507 ("Nor are we persuaded that

the bankruptcy court erred in finding that [the corporation] was [the debtor's] *alter ego*.")

(emphasis in original). As such, the bankruptcy court had properly concluded that the transfer of

corporate inventory had been a transfer of an interest of the debtor-shareholder in property.

Because of the uncertainty in the law in this area, and because this is an area of state and

not federal law, this court will attempt to hew closely to the approach taken by the court in

*Fisher*, even though it is an unpublished decision, since the decision in *Fisher* is the only

35

decision of a federal Court of Appeals (that this court has found) at least tacitly approving the

use of the alter ego doctrine in the manner in which the trustee seeks to use it in this case.

There, again, the court focused on substantive state law allowing the corporate form to

simply be disregarded (in reverse) where the stock of the corporation was owned *entirely* by one

person. Then, it applied the alter ego concept as that concept had been articulated in the Seventh

Circuit's *Elite Erectors* case to treat the transfer of corporate property as the transfer of an

interest of the debtor in property.

As far as substantive state law is concerned, the statement of Ohio law that the court in

*Fisher* relied on (see above) is nearly identical to statements of Illinois law in this area where the

corporate form is being disregarded generally and not to impose vicarious personal liability on

another legal personality, so adherence to the "wholly owned" approach in *Fisher* makes just as

much sense under Illinois law in this case as it did under Ohio law in *Fisher*. *See Fisher*, 296 F.

App'x at 505–06 (quoting *Knight v. Burns*, 154 N.E. 345, 346 (Ohio Ct. App. 1926); *Hartigan*,

498 N.E.2d at 600 ("[A] corporation with *only one stockholder* will be treated as his alter ego. In

such cases, the courts will deal with the substance of the transaction involved as if the corporate

agency did not exist.") (emphasis added); *Chicago-Crawford*, 199 N.E.2d at 299 ("It has been

frequently held that the *owner of all of the stock of a corporation* will be treated as its alter ego,

and these cases have refuted the fiction of separate legal entities in cases where used as a

protection to fraud or other illegal transactions.") (emphasis added).

This court will therefore limit the application of the alter ego doctrine to corporations

where the Debtor, Michael Wolf, owned 100% of the stock in the corporation during the relevant

time-periods. With respect to those corporations, then, any transfers of their property *may* be

treated as transfers of the Debtor's property prior to the bankruptcy filing under the alter ego

doctrine as articulated by the courts in *Fisher* and *Elite Erectors*.

The court begins first with Zig Zag. Under Illinois law, the decision as to whether to

collapse two legal personalities into one pursuant to the alter ego doctrine is left to the discretion

of the trial court. *See In re Kreisler*, 331 B.R. 364, 379 (Bankr. N.D. Ill. 2005), *aff'd*, 352 B.R.

671 (N.D. Ill. 2006), *rev'd and remanded on other grounds*, 546 F.3d 863 (7th Cir. 2008).

> Generally, before the separate corporate identity of one corporation will be
> disregarded and treated as the alter ego of another, it must be shown that it is so
> controlled and its affairs so conducted that it is a mere instrumentality of another,
> and it must further appear that observance of the fiction of separate existence
> would, under the circumstances, sanction a fraud or promote injustice.

*Main Bank of Chicago v. Baker*, 427 N.E.2d 94, 101 (Ill. 1981).

Here, again, the court, in applying the alter ego doctrine, finds it crucial that Michael

Wolf was Zig Zag's sole shareholder at all relevant times. *See Dep't of Transp. v. Heritage-

Pullman Bank & Tr. Co.*, 826, 627 N.E.2d 191, 193 (Ill. App. Ct. 1993); *Hartigan*, 498 N.E.2d at

600; *cf. Fisher*, 296 F. App'x at 505–06 (relying on a nearly identical statement of Ohio alter ego

law requiring the stock of the entity to be solely owned by one person). An application of the

traditional factors for determining when to disregard a separate legal personality is appropriate as

well, however. *See Fisher*, 296 F. App'x at 506 (considering the traditional factors in

determining whether the disregard of the corporate form was appropriate); *see also Melko v.

Dionisio*, 580 N.E.2d 586, 595 (Ill. App. Ct. 1991) ("[T]he mere allegation that he was a

dominant or sole shareholder is insufficient to enable a court to disregard the separate corporate

existence.").

Here, of the many factors able to be considered, the court finds that the allegations

establish that Michael Wolf failed to observe corporate formalities and commingled funds by

paying personal and family expenses (such as personal and family credit card debts) directly with

corporate funds, diverted assets from Zig Zag to a closely related entity (ZZC) to the detriment of creditors, and, in transferring the MMQB business assets for no consideration to ZZC, failed to maintain *arms-length* relationships among related entities. *Bank of Am. v. WS Mgmt., Inc.*, 33 N.E.3d 696, 727 (Ill. App. Ct. 2015) (listing the factors to be considered). Also, the fact that Michael Wolf, as alleged, continues to run the MMQB business and continues to receive income from it, along with the fact that he built and ran the business for nearly three decades, points to Zig Zag having been used as a mere façade for the operation of its *sole* stockholder, Michael Wolf. *See id.*

Thus, because Michael Wolf was Zig Zag's sole stockholder, because funds were commingled and used for personal expenses, because Zig Zag's business assets were diverted to related entities for no consideration, and because Michael Wolf is the dominant personality behind the MMQB business originally held by Zig Zag, there is such unity and interest of ownership that Zig Zag and Michael Wolf should be treated as the same legal personality.

The allegations, taken as true, also show that Zig Zag's assets (the MMQB business) were drained from Zig Zag for no consideration and as part of an actually fraudulent scheme to hinder Michael Wolf's creditors. *See Chicago-Crawford*, 199 N.E.2d at 299. Thus, as alleged, it can be seen that the sole stockholder (Michael Wolf) has used Zig Zag to promote fraud by draining its assets in an intentional attempt to prevent his creditors from reaching the value of the business, and thus the separate personality of Zig Zag should be disregarded. *See Main Bank*, 427 N.E.2d at 101 (noting that, in order to disregard the separate corporate personality, the personality must have been used to sanction a fraud or promote an injustice).

Zig Zag will therefore be treated as the alter ego of Michael Wolf; the two will, for the

rest of the analysis, be treated as having had the same legal personality during the period of time

over which the corporation was used to further Michael Wolf's allegedly fraudulent scheme.

What about the rest of the entities? Due to the strong resemblance of the alter ego

doctrine as used in this case to reverse veil-piercing, *see In re Teleservices Grp., Inc.*, 469 B.R.

713, 728 n.45 (Bankr. W.D. Mich. 2012) (questioning the distinction between the two concepts

drawn by the court in *Fisher* and suggesting that the court in *Fisher* was really substantively

consolidating the debtor and the closely held corporation under substantive federal bankruptcy

law, not substantive Ohio law, in order to reach the result that the corporation's transfer of its

inventory was a transfer of an interest of the debtor in property), and due to the highly uncertain

nature of state law in this area, *see In re Glick*, 568 B.R. 634, 661–64 (Bankr. N.D. Ill. 2017)

(discussing both Illinois and Delaware law), the court will respect their separate existence. *See*

*Glick*, 568 B.R. at 664 (noting that where state law is unclear, federal courts should adopt an

interpretation of state law that restricts liability rather than expands it); *In re Duckworth*, No. 10-

83603, 2012 WL 4434681, at *8 (Bankr. C.D. Ill. Sept. 24, 2012) (noting that extreme caution in

this area is warranted).

The allegations regarding ZZC, for instance, are not clear on whether the ZZC that

allegedly received the MMQB business was the Illinois or the Delaware ZZC. Moreover, by the

time the business was allegedly fraudulently transferred *from* ZZC, Michael Wolf was only a

49% shareholder in the corporation. For MMQB, Inc. and the rest of the entities named in the

complaint, Michael Wolf has never owned *any* of the stock in those companies. While this fact

might not hold as much water in a traditional veil-piercing case, this court has chosen to take a

conservative approach in light of the uncertainty in state law in this area and to respect the

separate existence of the corporate entities named in the complaint except where the allegations

clearly show that Michael Wolf was the sole shareholder of the entity during the relevant time-

periods, including, most importantly, during the time when the MMQB business was allegedly

fraudulently transferred *out of* the entity.

### b. Count II: Turnover

The trustee, in Count II, asks for turnover of the MMQB business. As alleged in the

complaint, however, the MMQB business has been transferred to MMQB, Inc., and the income

of the business is being funneled through several other entities. If the Debtor (personally) or Zig

Zag (the Debtor's alter ego) owned the property comprising the MMQB business (including its

equipment, any inventory, any intellectual property, any goodwill, and any receivables) as of the

petition date, then turnover under section 542 might be appropriate. *See In re Roti*, 271 B.R. 281,

291–92 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Nelmark v. Helms*, No. 02 C 0925, 2003 WL

1089363 (N.D. Ill. Mar. 11, 2003).

As it stands, however, the business components have allegedly been transferred to

various third-party entities, including MMQB, Inc., in a scheme to defraud Michael Wolf's

creditors, and all of this happened pre-petition. The alleged ultimate transferee of the business,

namely MMQB, Inc., is not being treated by this court as the alter ego of the Debtor, Michael

Wolf, nor are any other entities other than Zig Zag. On these alleged facts, the MMQB business

(or its value) cannot be recovered by the trustee from any of the defaulted Defendants based on

this count as a matter of law. *See Bank of America v. Veluchamy (In re Veluchamy)*, 879 F.3d

808, 816 (7th Cir. 2018) (noting that a turnover action cannot be used where the property in

question was transferred to someone else prior to the petition date; also noting that a turnover